# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the
State of New York
28 Liberty Street
New York, NY 10005; and

NEW YORK STATE ENERGY RESEARCH AND
DEVELOPMENT AUTHORITY
17 Columbia Circle
Albany, NY 12203,

        Plaintiffs,

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the United States Department of the
Interior
1849 C Street, NW
Washington, DC 20240;

UNITED STATES DEPARTMENT OF THE
INTERIOR
1849 C Street, NW
Washington, DC 20240;

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean Energy
Management
1849 C Street, NW
Washington, DC 20240; and

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street, NW
Washington, DC 20240,

        Defendants.

C.A. No. 26-cv-00071

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs the State of New York and the New York State Energy Research and Development Authority (NYSERDA) (collectively, the State), by their attorney Letitia James, Attorney General of the State of New York, as and for their complaint, allege as follows, upon information and belief, against defendants United States Department of the Interior (DOI); Douglas Burgum, Secretary of DOI (the Interior Secretary), in his official capacity; the Bureau of Ocean Energy Management (BOEM); and Matthew Giacona, Acting Director of BOEM, in his official capacity (collectively, Agency Defendants):

## INTRODUCTION

1.    The State brings this action to challenge, declare unlawful, and enjoin the December 22, 2025 order (the Suspension Order) that was issued by Acting Director Giacona and directed Empire Offshore Wind LLC and Empire Leaseholder LLC (together, Empire Wind) to "suspend all ongoing activities related to [the Empire Wind Project] on the Outer Continental Shelf for the next 90 days for reasons of national security."[1]

2.    The Empire Wind Project is a commercial wind installation under construction in federal waters on the Outer Continental Shelf, around 14 miles southeast of Long Island, with transmission connections and landward infrastructure in New York. It is expected to have a nameplate capacity (maximum power output)

---

[1] Letter from Matthew N. Giacona, Acting Director, BOEM, to Matthew Brotmann, Secretary, Empire Wind (Dec. 22, 2025).

of 810 megawatts, enough to power over 500,000 New York homes. The Project would be the first offshore wind project to deliver power directly to New York City.

3.     Empire Wind has entered into a contract with NYSERDA for the Empire Wind Project, which has been fully permitted since February 2024 and under construction since June 2024. The Project is expected to be completed in 2027.

4.     The Empire Wind Project is crucial to New York because the addition of offshore wind generation to New York's energy mix will help ensure the reliability (i.e., adequate generation to meet demand) and diversity (i.e., different fuel sources) of New York's energy grid and help to meet New York's statutory climate goals.

5.     New York's Energy Law has long committed New York to a rigorous planning process designed to further several goals. These include reducing environmental impacts, improving the reliability of New York's energy systems, reducing costs of energy, and protecting against energy market volatility. *See* N.Y. Energy Law § 6-102(5). That planning process involves a study of electricity reliability expected every four years, including "generation using renewable or innovative energy resources" and "accommodation of proposed new electric generation facilities." *Id.* § 6-108(1)–(2).

6.     Offshore wind has been a major part of New York's long-term energy planning for many years, dating back to studies begun by NYSERDA over a decade ago. In 2018, New York's Public Service Commission (the PSC) adopted an "Offshore

Wind Standard" calling for the procurement of offshore wind energy generation to serve New York's electricity needs.[2]

7. Also in 2018, after two years of in-depth research, analysis, and outreach, New York issued an Offshore Wind Master Plan, which explained that "[t]he development of offshore wind energy . . . will stimulate the State's economy, support revitalization of maritime communities, spur infrastructure investment, and help create a new American industry centered in New York State that will create thousands of new jobs for skilled workers."[3]

8. Pursuant to the energy planning process mandated by its Energy Law, New York recently released its 2025 State Energy Plan. The Plan finds that offshore wind is expected to make up a material component of new generation needed to meet New York's growing need for abundant, reliable, affordable, and clean energy.

9. In 2019, the New York Legislature passed the Climate Leadership and Community Protection Act (the Climate Act), declaring that "[c]limate change is adversely affecting economic well-being, public health, natural resources, and the environment of New York." Climate Act, S.B. 6599, 2019-2020 Reg. Sess. § 1 (N.Y. 2019) (codified at N.Y. Env't Conserv. Law §§ 75-0101 *et seq.*). The adverse impacts found by the Legislature include extreme heat waves; storms; rising sea levels; and negative health consequences, including increases in infectious diseases, asthma attacks, and heart attacks. To combat climate change, the Climate Act instituted

---

[2] *In re Offshore Wind Energy*, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n 2018).

[3] NYSERDA, Report No. 17-25, *New York State Offshore Wind Master Plan* 5 (2018).

numerous statewide clean energy targets, including the procurement of at least 9 gigawatts of electricity generated by offshore wind resources to serve New York's electricity system by 2035.

10.    As the administrator of New York's Offshore Wind Standard, NYSERDA enters into long-term contracts with offshore wind developers to deliver renewable energy within New York and fulfill the goals of the Climate Act. Pursuant to that authority, NYSERDA entered into a contract with Empire Wind after the developer obtained its offshore wind lease from BOEM.

11.    The Empire Wind Project has received all federal, state, and local approvals necessary for its construction and operation. These approvals are the result of multiple, multi-year national security and environmental reviews. As part of the federal approval process, Empire Wind agreed to conditions imposed by the Department of War[4] (DOW) to ensure that the Project appropriately mitigated all national security issues. In approving the Project, BOEM found that it is both safe and consistent with federal law.

12.    Despite this, more than two years after the Project's approval, BOEM's Suspension Order asserts that a November 2025 DOW "assessment" provided DOI with new and classified information that led BOEM to conclude that the approved

---

[4] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Exec. Order 14347, "Restoring the United States Department of War" (Sept. 5, 2025). This complaint uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."

lease activities must be suspended while the agency considers whether the potential harms can be mitigated.

13.    This is the Agency Defendants' second attempt to halt construction of the Empire Wind Project. On April 16, 2025, Agency Defendants issued a stop work order requiring the Project to halt construction, only lifting the order, without explanation, when the Project was on the brink of collapse.

14.    BOEM's Suspension Order is arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), because it fails to (1) provide a reasoned explanation for suspending all activities; (2) explain Agency Defendants' change in position; (3) explain why a narrower alternative would not have addressed the Agency Defendants' concerns; or (4) provide a genuine justification for the suspension. The Court should therefore vacate the Suspension Order and enjoin Agency Defendants from taking further action with respect to it.

## PARTIES

15.    Plaintiff State of New York is a sovereign state in the United States of America and is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

16.    Plaintiff NYSERDA is a public benefit corporation and public authority incorporated under Title 9 of the New York State Public Authorities Law. Pursuant to this authority, NYSERDA plays a leading role in designing and implementing New York's policies and programs that advance the energy-related legislative, regulatory, and policy goals of New York. Among its programmatic activities, NYSERDA

administers New York's Offshore Wind Standard pursuant to orders issued by the PSC. As administrator of this program, NYSERDA enters into long-term contracts with offshore wind developers to deliver renewable electricity to New York consumers. NYSERDA is also one of the state entities responsible for implementing the Climate Act, which includes targets of creating 9 gigawatts of offshore wind energy by 2035 and achieving zero-emissions electricity by 2040.

17.    Defendant DOI is a cabinet agency within the executive branch of the United States government. DOI has responsibility over leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to the Outer Continental Shelf Lands Act (OCSLA) and its implementing regulations.

18.    Defendant Douglas Burgum is the Interior Secretary and DOI's highest-ranking official. He is sued in his official capacity. Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA, and for all official actions or inactions of DOI and BOEM challenged in this action.

19.    Defendant BOEM is a bureau within DOI. BOEM is responsible for the administration, leasing, and permitting of offshore energy projects on the Outer Continental Shelf pursuant to OCSLA.

20.    Defendant Matthew Giacona is the Acting Director of BOEM and BOEM's highest-ranking official. He is sued in his official capacity. Acting Director Giacona issued the Suspension Order.

## JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§ 1331, 2201(a). The Court also has jurisdiction under the judicial-review provisions of the APA. 5 U.S.C. § 702.

22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States officers and agencies sued in their official capacities, and they perform their official duties in the District of Columbia. A substantial part of the events or omissions giving rise to this complaint occurred and continues to occur within the District of Columbia.

## LEGAL BACKGROUND

### The Outer Continental Shelf Lands Act

23.    OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public," and directs the Interior Secretary to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. 43 U.S.C. § 1332(3).

24.    In 2005, Congress amended OCSLA to authorize the Interior Secretary to issue leases on the Outer Continental Shelf for renewable energy production.[5] In doing so, Congress sought to "enhance the energy security of the United States,"

---

[5] *See* Energy Policy Act of 2005 § 388, Pub. L. No. 109-58, 119 Stat. 594, 744-45 (2005).

"decrease dependance on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

25.    Pursuant to OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, or transmission of energy sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c. The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" a set of twelve enumerated factors, including safety, protection of the environment, prevention of waste, protection of national security interests of the United States, and prevention of interference with other reasonable uses of the Outer Continental Shelf. *Id.* § 1337(p)(4).

26.    BOEM administers the Outer Continental Shelf leasing program pursuant to its renewable energy regulations under OCSLA, contained in 30 C.F.R. Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out, usually through a competitive bidding process. 30 C.F.R. § 585.102

27.    Once a lease is sold, a lessee must submit a Site Assessment Plan for site assessment activities. *Id.* §§ 585.600, 585.605-585.613. If BOEM approves the Site Assessment Plan, the lessee has five years to conduct site assessment activities to gather necessary data. *Id.* § 585.235(a)(2).

28.    The lessee must then prepare a proposal for the development of a wind energy facility and submit an application for a Construction and Operations Plan. *Id.* §§ 585.600, 585.620-585.629. The Construction and Operations Plan must demonstrate, among other things, that the project will be conducted in a manner that does not unreasonably interfere with other uses of the Outer Continental Shelf, including those relating to national security or defense. *Id.* § 585.621(d).

29.    BOEM then conducts a thorough review of a project's Construction and Operations Plan, including developing an environmental impact statement, coordinating with other agencies (including DOW) and interested stakeholders, as well as complying with numerous other federal laws. *Id.* § 585.628; 43 C.F.R. pt. 46. BOEM must review the application to ensure compliance with OCSLA and its regulations, and then "approve, disapprove, or approve [the plan] with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f).

30.    BOEM's regulations require BOEM to ensure that activities authorized under its renewable energy regulations are carried out "in a manner that provides for and reaches for a balance among" the twelve factors enumerated by OCSLA. *Id.* § 585.102(a). The regulations further state that "[t]o the extent [the factors] conflict or are otherwise in tension, none of [the factors] inherently outweighs or supplants any other." *Id.*

31.    OCSLA provides very narrow authority for suspending operations due to national security concerns. It directs the Interior Secretary to include in all leases "a provision whereby authority is vested in the Secretary, upon a recommendation of

the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, after August 7, 1953, to suspend operations under any lease." 43 U.S.C. § 1341(c). It also provides for payment of compensation in the event of such a suspension. *Id.*

## FACTUAL ALLEGATIONS

## I.    New York's Offshore Wind Standard and the Empire Wind Project

32.    In 2018, the New York PSC adopted the Offshore Wind Standard. In doing so, the PSC recognized that offshore wind "is projected to provide numerous benefits in addition to . . . reducing greenhouse gas emissions. Because of its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system. Offshore wind also has the potential to create thousands of jobs for New Yorkers, both in construction of the facilities and in the operations and maintenance of the completed projects. It may also produce significant public health benefits by displacing fossil-fired generation in the downstate area."[6]

33.    The Offshore Wind Standard requires utilities and other load-serving entities (entities that provide electricity to customers) to procure offshore wind renewable energy certificates, which represent the environmental attributes of offshore wind-generated renewable energy delivered into New York.

34.    As part of this process, in its role as central procurement administrator, NYSERDA conducts offshore wind solicitations, which seek proposals from offshore

---

[6] *In re Offshore Wind Energy*, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n 2018).

wind developers to deliver offshore wind energy to New York. The competitively selected projects enter into contracts to sell renewable energy certificates to NYSERDA, which then sells the certificates to utilities and other load serving entities to comply with the Offshore Wind Standard.

35.    In November 2018, NYSERDA launched its first offshore wind solicitation. In May 2019, NYSERDA selected the Empire Wind Project, contingent on the negotiation of a final agreement. In October 2019, NYSERDA entered into an agreement with Equinor Wind US LLC (Equinor US), pursuant to which NYSERDA agreed to purchase renewable energy certificates from Equinor US. Equinor US assigned the contract to Empire Wind. In 2024, following a solicitation process, that contract was replaced with a new contract with similar terms. The contract's purchase and sale obligations last for a term of 25 years, starting after the Project begins delivering energy to New York.

36.    The Empire Wind Project is an 80,000-acre wind farm that will be located in federal waters on the Outer Continental Shelf, around 14 miles southeast of Long Island. The Project as proposed includes development of the lease area in two phases: Empire Wind 1 and Empire Wind 2. Empire Wind 1 is currently under construction and is expected to have a nameplate capacity of 810 megawatts, with 54 turbines capable of powering over 500,000 homes. The Empire Wind Project would be the first offshore wind project to deliver power directly to New York City. The first power is expected to be delivered in late 2026, and the Project is expected to be fully

12

operational in 2027. The Empire Wind Project is being developed by Empire Wind, comprised of two Equinor affiliates.

## II.    Federal Permitting of the Empire Wind Project

37.    The Empire Wind Project has been the subject of BOEM's leasing and permitting process for almost a decade.

38.    In December 2016, Equinor US[7] acquired the Project's offshore lease in a competitive auction run by BOEM. The lease has since been assigned to Empire Wind.

39.    Pursuant to OCSLA, Empire Wind's lease provides that BOEM may "suspend . . . operations in accordance with the national security and defense provisions of [43 U.S.C. § 1341] and applicable regulations."[8]

40.    The lease further states that "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations," and "[s]uspensions or evacuations for national security reasons will generally not exceed 72 hours."[9]

---

[7] Equinor US was previously named Statoil Wind US LLC.

[8] BOEM, Empire Wind Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf 2 (§ 3(c)) (Apr. 1, 2017).

[9] *Id.* at Appendix C-5 to C-6.

41.    Equinor US submitted a Site Assessment Plan to BOEM in June 2018,[10] which BOEM approved in November 2018.[11] Empire Wind submitted a proposed Construction and Operations for the Project in January 2020.[12] The proposed Plan contained almost 300 mitigation and monitoring measures directed toward minimizing the Project's potential impacts, including potential impacts on national security.

42.    In November 2022, BOEM published a Draft Environmental Impact Statement. The U.S. Army Corps of Engineers and the U.S. Coast Guard served as cooperating agencies and DOW and the Department of the Navy served as participating agencies in the Project's environmental review process. BOEM accepted public comment on the Draft Environmental Impact Statement and held three virtual public meetings.

43.    In September 2023, BOEM published the Empire Wind Project's Final Environmental Impact Statement (FEIS). The FEIS "assesses the reasonably foreseeable impacts on physical, biological, socioeconomic, and cultural resources that could result from the construction and installation, operations and maintenance

---

[10] Equinor US, Site Assessment Plan: Empire Wind Offshore Wind Farm Project (June 2018).

[11] Letter from James F. Bennett, Program Manager, BOEM Off. of Renewable Energy Programs, to Martin Goff, Leader-Permitting, Equinor US (Nov. 21, 2018).

[12] Equinor, Empire Offshore Wind: Empire Wind Project (EW1 and EW2) Construction and Operations Plan (Nov. 2023).

(O&M), and conceptual decommission" of the Project.[13] BOEM considered a range of alternatives and selected a combination of alternatives that would reduce and/or mitigate the Project's impacts.

44.    In November 2023, BOEM and the National Marine Fisheries Service issued a joint Record of Decision for the Project, approving construction of 147 wind turbines within the lease area.[14] The Record of Decision explains that, "[a]t each stage of the regulatory process," including the decision to offer for lease the relevant portion of the Outer Continental Shelf in the first place, BOEM "consulted with the Department of Defense . . . for the purposes of assessing national security considerations in its decision-making processes."[15] The Record of Decision concluded that approving the Construction and Operations Plan, as modified by the combination of alternatives selected by BOEM and the terms and conditions included in the Record of Decision, "would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the [Outer Continental Shelf] are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA," which include "protection of national security interests of the United States."[16]

---

[13] BOEM, Empire Offshore Wind Final Environmental Impact Statement Vol. 1 at S-1 (Sept. 2023).

[14] BOEM, Record of Decision, Empire Offshore Wind: Empire Wind Project (EW1 and EW2) Construction and Operations Plan (Nov. 20, 2023).

[15] *Id.* at 18.

[16] *Id.* at 29.

45.     In reviewing Empire Wind's Construction and Operations Plan, BOEM coordinated with DOW to address national security concerns and avoid or mitigate them. The Record of Decision requires Empire Wind to mitigate any potential impacts on national security by entering into an agreement with DOW to take certain actions. For example, Empire Wind must contribute $80,000 to the North American Aerospace Defense Command (NORAD) to manage radar adverse impacts. Empire Wind must also notify DOW and others at least 30 days prior to the commissioning of the Empire Wind Project's last wind turbine to schedule Radar Adverse Impact Management. In addition, Empire Wind must coordinate with the Department of the Navy on any proposal to use distributed fiber-optic sensing technology as part of the Project.

46.     At the same time that it issued the Record of Decision, BOEM published a memorandum in which it evaluated the information contained in the Empire Wind Project's FEIS and Construction and Operations Plan and determined that the Project would be carried out in accordance with the factors listed in OCSLA, 43 U.S.C. § 1337(p)(4), which include the "protection of national security interests of the United States."

47.     BOEM approved the Empire Wind Project's Construction and Operations Plan in February 2024, allowing construction to proceed.[17] Since that

---

[17] Letter from Karen J. Baker, Chief, BOEM Office of Renewable Energy Programs, to Matthew Brotmann, Secretary, Empire Wind (Feb. 21, 2024).

time, Empire Wind has been in regular contact with DOW and NORAD concerning the required mitigation agreement. On December 12, 2025, just ten days before BOEM issued the Suspension Order, NORAD staff informed Empire Wind that the mitigation agreement had been drafted and was still under review by DOW.[18]

48.    On April 14, 2025, the U.S. Government Accountability Office (GAO) issued a report that describes "the mechanisms BOEM, in coordination with other agencies, has in place to oversee offshore wind energy development and to what extent they address potential impacts."[19] GAO found that "BOEM obtains input from multiple federal agencies, state governments, Tribes, and other stakeholders to identify and mitigate potential impacts of offshore wind energy projects."[20] The report also noted that "BOEM requires . . . that offshore wind developers take steps to mitigate potential adverse environmental impacts."[21] GAO did not find any programmatic failures regarding BOEM's environmental analysis and mitigation of offshore wind projects.

## III.    Construction Status of the Empire Wind Project

49.    The Empire Wind Project is in an advanced stage of construction, with nearly 60% of work complete. The Empire Wind Project requires a transmission line

---

[18] Decl. of Elisabeth Treseder ¶ 27, *Empire Leaseholder LLC v. Burgum*, 26 Civ. 04 (D.D.C. Jan. 6, 2026).

[19] GAO, GAO-25-106998, Offshore Wind Energy: Actions Needed to Address Gaps in Interior's Oversight of Development 52 (Apr. 2025).

[20] *Id.* at 29.

[21] *Id.* at 31.

to connect the electricity produced by its offshore wind turbines to the electric grid. This transmission line will run 17.5 miles from New York State territorial waters to a newly constructed substation at the South Brooklyn Marine Terminal (the Marine Terminal).

50.     Offshore site preparation began in July 2024. At that time, Empire Wind undertook a process to clear obstacles from the ocean floor that might block the path of or damage the undersea cables connecting its offshore turbines to the Marine Terminal.[22] This work included pre-lay grapnel runs (pulling a metal chain across the ocean floor to remove debris), debris removal using a crane, boulder relocation, and removing abandoned undersea cables along the cable route between Gowanus Bay in New York Harbor and the lease area.

51.     Between June and October 2025, Empire Wind installed the 54 monopile foundations that will support the Project's wind turbine generators. Empire Wind's construction activities were carefully scheduled to avoid critical periods for wildlife migration. Empire Wind has now almost completed the installation of two 46-mile offshore export cables that will deliver power from the wind turbines to the shore.

52.     Empire Wind began onshore construction in April 2024. As part of the Empire Wind Project, the 73-acre Marine Terminal is being upgraded to enable it to serve as a staging facility and operations and maintenance base. It will also be the site of the Empire Wind Project's onshore substation. Empire Wind began

---

[22] Equinor, Empire Wind 1: Preparing for Offshore Wind Cable Installation (July 31, 2024).

construction to upgrade the Marine Terminal in June 2024.[23] A critical aspect of this work involves driving piles into the ground beneath the terminal so that it can support the weight of heavy turbine components, such as nacelles and turbine blades, as well as the heavy equipment needed, including cranes.[24]

## IV.    Administration Actions Targeting the Wind Industry

53.    On January 20, 2025, President Trump issued a memorandum that halted all federal approvals necessary for the development of offshore and onshore wind energy (the Wind Memo).[25] Pursuant to the Wind Memo, several federal agencies ordered an immediate pause in the issuance of all wind energy authorizations (the Wind Order).

54.    The same day the Wind Memo was issued, President Trump declared a "National Energy Emergency" (the National Energy Emergency Memo), purportedly brought on by the country's alleged "insufficient energy production," to shore up the "inadequate energy supply" by facilitating the development of "a reliable, diversified, and affordable supply of energy."[26]

---

[23] Press Release, Empire Wind, Groundbreaking at South Brooklyn Marine Terminal to Transform Port into NYC Offshore Wind Hub (June 10, 2024).

[24] Empire Wind, Empire Energizer Community Update (Aug. 28. 2024).

[25] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind, 90 Fed. Reg. 8,363 (Jan. 29, 2025).

[26] Exec. Order 14,156, Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan. 29, 2025).

55.     On April 16, 2025, BOEM issued an order requiring Empire Wind to "halt all ongoing activities related to the Empire Wind Project on the outer continental shelf to allow time for [BOEM] to address feedback it has received, including from the National Ocean and Atmospheric Administration (NOAA), about the environmental analyses for that project."[27] BOEM described this order as an "outgrowth" of the review that DOI was undertaking pursuant to President Trump's Wind Memo.[28] BOEM lifted the order on May 19, 2025, allowing work to continue.

56.     In response to the Energy Emergency Memo, on April 23, 2025, DOI announced it "will implement emergency permitting procedures to accelerate the development of domestic energy resource."[29] As part of these procedures, DOI "will be adopting an alternative National Environmental Policy Act compliance process to allow for more concise documents and a compressed timeline."[30] Under the compressed timeline "[p]rojects requiring a full environmental impact statement, typically a two-year process, will be reviewed in roughly 28 days."[31]

57.     On July 7, 2025, President Trump issued another executive order, this time directing the Interior Secretary to eliminate all sources of "preferential

---

[27] Letter from Walter D. Cruickshank, Acting Director, BOEM, to Matthew Brotmann, Secretary, Empire Offshore Wind (Apr. 16, 2025).

[28] *Id.*

[29] Press Release, DOI, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025).

[30] *Id.*

[31] *Id.*

treatment" for wind and solar energy.[32] The executive order characterized wind energy as "expensive and unreliable," as "denigrat[ing] the beauty of our Nation's natural landscape," and as "threaten[ing] national security by making the United States dependent on supply chains controlled by foreign adversaries."[33]

58.    On August 22, 2025, BOEM issued another order, now directing a halt to work on Revolution Wind, a wind farm off the coast of Rhode Island.[34] BOEM described this order as stemming from a national security review undertaken pursuant to President Trump's Wind Memo. A few weeks later, on September 22, 2025, this Court granted the project developer's motion for a preliminary injunction, finding that the developer had demonstrated a likelihood of success on the merits. Specifically, the Court explained that BOEM's order represented "a clear change in position on the part of [BOEM], which previously certified that the [Revolution Wind] project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process," and that BOEM "did not make any factual findings or cite any reasons to believe that [] Revolution Wind was no longer in compliance with [OCSLA]."[35]

---

[32] Exec. Order 14,315, Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources, 90 Fed. Reg. 30,821 (July 7, 2025).

[33] *Id.* § 1.

[34] Letter from Matthew N. Giacona, Acting Director, BOEM, to Rob Keiser, Head of Asset Management, Ørsted North America Inc. (Aug. 22, 2025).

[35] Tr. of Prelim. Inj. Hearing at 41:1-19, *Revolution Wind, LLC v. Bergum*, No. 25 Civ. 2999 (D.D.C. Sept. 22, 2025).

59. On December 8, 2025, the United States District Court for the District of Massachusetts (Saris, J.) issued a memorandum and order declaring that the Wind Order "constitutes a final agency action that is arbitrary and capricious and contrary to law" and vacating it. *New York v. Trump*, No. 25 Civ. 11221, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

## V.    BOEM's December Suspension Orders

60. On December 22, 2025, just two weeks after the Wind Order was vacated, Acting Director Giacona issued orders invoking 30 C.F.R. § 585.417(b) and directing various offshore wind projects, including the Empire Wind Project, to "suspend all ongoing activities related to the [Project] on the Outer Continental Shelf for the next 90 days for reasons of national security."[36] These single-page Suspension Orders are purportedly based on "national security threats" raised in a November 2025 classified assessment conducted by DOW, which Acting Director Giacona admits he received and reviewed on November 26, 2025, nearly one month before issuing the Suspension Orders.[37] The Suspension Orders state that BOEM could "further extend the 90-day suspension" pending its discussions with DOW.

61. Like the other Suspension Orders, the Suspension Order for the Empire Wind Project did not identify any component of the Project that raised new national security concerns; explain why the Project's existing mitigation measures would not

---

[36] *Supra* note 1.

[37] Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25 Civ. 830 (E.D. Va. Dec. 27, 2025).

sufficiently address such concerns; explain BOEM's change in position; consider Empire Wind or New York's reliance on BOEM's past approval of and support for the Project; or consider alternatives to suspending the Project.

62.    The Suspension Order "invites" Empire Wind to "meet and confer" about potential mitigation measures but offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days or more may be required for resolution.[38]

63.    Despite the 2005 amendments to OCSLA making the Outer Continental Shelf available for renewable energy production, including offshore wind, the Interior Secretary has made countless statements in public interviews and announcements maligning offshore wind energy that are unrelated to national security.

64.    Even though BOEM claims to base the Suspension Order on the Empire Wind Project's "potential to cause serious, immediate, and irreparable harm" to national security,[39] Acting Director Giacona did not issue the Order until December 22, 2025, nearly a month after he first reviewed the classified information purportedly supporting that determination.

65.    In a press release issued the same day, DOI discussed "unclassified reports from the U.S. Government," including a 2024 report.[40] DOI also attempted to

---

[38] Letter from Matthew N. Giacona, *supra* note 1.

[39] *Id.*

[40] Press Release, DOI, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025).

justify the Suspension Orders by citing alleged "national security risks inherent to large-scale offshore wind projects," namely, "the movement of massive turbine blades and the highly reflect towers [that] create radar interference called 'clutter,'" which purportedly "obscures legitimate moving targets and generates false targets in the vicinity of the wind projects."[41] As DOI acknowledges, the potential for "clutter" is not new information, and in fact, the issue was described in an unclassified Department of Energy report from 2024.

66.    On December 22 and 23, 2025, in interviews with Fox News concerning the Suspension Orders, the Interior Secretary contended that offshore wind projects are unreliable, unaffordable, and bad for marine life. He also posted on social media platform X that offshore wind is a "scam" and a "GIANT rip off for every American consumer."[42]

---

[41] *Id.*

[42] "Offshore wind is the MOST EXPENSIVE form of electricity in our country. This is a self inflicted pricing issue for residents in New England when we have abundant natural gas nearby in Pennsylvania!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 12:59 p.m.), https://x.com/SecretaryBurgum /status/2003163435320926688; "Due to national security concerns, by the [DOW], [DOI] is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms! ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED. [President Trump] is bringing common sense back to energy policy & putting security FIRST!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:25 a.m.), https://x.com/SecretaryBurgum/status/2003094666040787213; "Offshore wind will DRIVE UP electricity prices in the Northeast. As one example, the Empire Wind project off the coast of New York is charging New Yorkers over TWO TIMES the local grid price for their energy. The Green New Scam is not just a waste of money on weather-dependent projects—; "Offshore wind will DRIVE UP electricity prices in the Northeast. As one example, the Empire Wind project off the coast of New York is charging New Yorkers over TWO TIMES the local grid price for their energy. The Green New Scam is not just a waste of money on weather-dependent projects—

67.    At a press conference on January 9, 2026, President Trump announced, "my goal is not to build any windmills in this country."[43] He offered several reasons for his opposition to wind energy but did not mention national security.

## VI.    New York's Injuries

### A.    The Viability of Empire Wind

68.    The wind energy industry operates in a tremendously complex logistical and regulatory environment, where even minor setbacks can dramatically increase costs and lead to projects being severely delayed and even abandoned.

69.    This is true for the Empire Wind Project. As Empire Wind has explained in its own challenge to the Suspension Order,[44] the Empire Wind Project has secured several specialized construction vessels for specific windows of time. These vessels, which are extremely expensive to charter, are necessary for a variety of tasks, including for the installation of the Project's cables and wind turbines. When delays occur, even for a matter of days or weeks, the Project risks losing access to these vessels, which have contractual commitments with other developers.

70.    Loss of access to such vessels can be disastrous for offshore wind developers. For example, Empire Wind chartered a specialized heavy lift vessel to lift

---

it's a con job forced upon the American people." Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 4:08 p.m.), https://x.com/SecretaryBurgum/status/2003573523147817368.

[43] Aaron Rupar (@atrupar), X (Jan. 9, 2026, at 4:10 p.m.), https://x.com/atrupar/status/2009734529045364757?s=46.

[44] Decl. of Theodore Muhlfelder ¶ 22, *Empire Leaseholder LLC v. Burgum*, 26 Civ. 04 (D.D.C. Jan. 6, 2026).

the Project's offshore substation topside (an above-water structure housing the technical equipment) off of a transport vessel and onto its jacket foundation (a large steel structure anchored to the seabed). If construction activities do not resume by January 16, 2026, and the lift does not begin by January 26, 2026, the maneuver will likely not be completed by the time the lift vessel must depart, and Empire Wind will lose access to the lift vessel for at least a year. Another specialized vessel needed to commission the Project's offshore substation is chartered through the end of June 2026, after which it will not be available for another five years.

71.     As these types of delays accumulate, the Empire Wind Project will quickly become uneconomical for Empire Wind. Thus, the Empire Wind's Suspension Order represents an existential threat to the Project, and the longer the Suspension Order remains in place, the less likely it is that the Project will be constructed.

72.     The Empire Wind Project provides myriad substantial benefits to New York on which New York relies. By imperiling the viability of the Project, the Suspension Order puts these benefits in jeopardy. The Suspension Order poses an immediate threat to New York's energy interests; economic interests; and environmental and public health interests

**B.     New York's Energy Interests**

73.     The addition of offshore wind generation in New York's energy mix provides critical resource diversity benefits to New York's energy system. A report authored on behalf of the New York Independent System Operator (NYISO) has noted that "[g]enerating resource diversity of all types—in fuel source, mode of operation,

geography, size, etc.—can contribute to the resilience and reliability of the power system."[45]

74.    According to analysis performed for New York's recently released 2025 State Energy Plan, future electricity demand is projected to grow due to large new loads (such as manufacturing and data center projects) and electrification of transportation and buildings. Consistent with those findings, NYISO, in its October 2025 Q3 Short-Term Assessment of Reliability Report, identified a need for additional electric generation, demand-side solutions, and/or transmission solutions to ensure electrical system reliability (i.e., adequate generation to meet demand) in New York City and Long Island by as early as summer 2026.

75.    The 2025 State Energy Plan finds that offshore wind is expected to make up a material component of new generation needed to meet New York's growing need for abundant, reliable, affordable and clean energy. Specifically, the Plan's core planning scenario includes 5 to 7 gigawatts of offshore wind energy being added to New York's electric grid by 2040, in addition to concurrent major investments in other renewable energy resources, nuclear generation, transmission, and battery storage.

76.    Meeting growing electricity load, while maintaining system reliability, will require investments in expansion of the electricity system. The 2025 State Energy Plan identifies a number of stressors to New York's electricity system that require substantial deployment of new energy resources alongside modernization of essential transmission and distribution infrastructure. Offshore wind energy, along

---

[45] Analysis Grp., *Fuel and Energy Security in New York State* 26 (Nov. 2023).

with other resources in New York's portfolio, is an essential contributor to New York's energy adequacy alongside other existing resources.

77.    Near-term alternatives to offshore wind energy in constrained areas like New York City are limited. The Empire Wind Project will contribute materially to ensuring grid reliability in New York City when it comes online.

78.    The Empire Wind Project, which is already in construction, is expected to begin delivering those energy benefits in the near term, as opposed to other potential future projects that are far more theoretical and would take longer to bring on line.

### C.    New York's Economic Interests

79.    The Suspension Order harms New York's economic interests by depriving New York of the benefits of its contracts with Empire Wind.

80.    The Empire Wind Project is expected to provide substantial tax revenue to New York, on the scale of hundreds of millions of dollars over the Project's lifetime.

81.    Additionally, NYSERDA's agreement with Empire Wind calls for over $800 million in total substantial economic benefits to accrue to New York. These benefits include investments in electrical infrastructure, establishment of operational and logistics facilities, the purchase of goods, services and materials from New York businesses, workforce development initiatives, and expenditures towards fish and wildlife monitoring. Empire Wind estimates that the Project will also support 4,000 jobs, ranging from tradespeople to regulatory compliance personnel.

82. If the Empire Wind Project does not proceed, these benefits will not accrue to New York.

83. The Project's cancellation would also impose major costs on New York. NYSERDA and other state agencies would need to invest substantial time and money to analyze the impact of the Project's cancellation and to determine whether the clean energy from the Project could be replaced. Any such replacement, if one existed, would likely be more expensive, as it is unlikely that the replacement's developer would have access to the same federal tax credits that the Project received, given the acceleration of the tax credits' expiration through the enactment of H.R. 1 in 2025.

84. In addition, cancellation of the Project would reflect a highly uncertain federal regulatory environment and chill the investment in and development of offshore wind in New York State.

### D. New York's Climate Goals and Environmental and Public Health Interests

85. The New York State Legislature enacted the Climate Act in July 2019. The Climate Act sets greenhouse gas-reduction targets of 40% by 2030 and 85% from 1990 levels by 2050. Climate Act § 1. It calls for New York to have a 100% emissions-free electricity sector by 2040 and be powered by 70% renewable energy. N.Y. Pub. Serv. Law § 66-p(2). The Climate Act also targets the development of 9 gigawatts of offshore wind energy by 2035. *Id.* § 66-p(5).

86. Offshore wind projects are expected to play a significant role as New York pursues a zero-emissions electric system pursuant to the Climate Act. The core planning scenario of New York's 2025 State Energy Plan includes 5 to 7 gigawatts of

offshore wind being added to New York's electric system by 2040, in addition to concurrent major investments in other renewable energy resources, nuclear generation, transmission, and battery storage to achieve a fully decarbonized grid.

87. The suspension of the Empire Wind Project's construction will impede New York's ability to fulfill its statutory goals under the Climate Act, thereby injuring New York's ability to implement its own laws. It also risks forcing New York to incur additional expenses to meet the Climate Act's emissions and renewable energy targets.

88. The Suspension Order will also have significant adverse environmental and public health consequences to New York if left in place.

89. Notably, the generation mix in New York City and Long Island was less than 4% zero-emission in 2024. It is anticipated that incorporating offshore wind in the locations where combustion turbines are now used to meet energy demand—for example, in the New York City metropolitan ozone nonattainment area—will reduce emissions and improve air quality for New Yorkers. By reducing the need for electric generation from combustion turbines, the Empire Wind Project is anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other toxic and hazardous air pollutants.

90. The halt in the Empire Wind Project's construction will delay reductions in greenhouse gas emissions and air quality improvements by stalling the transition from fossil fuel-based energy to energy derived from renewable sources, including offshore wind.

# CLAIM FOR RELIEF

## The Stop Work Order Is Arbitrary and Capricious
## In Violation of the Administrative Procedure Act, 5 U.S.C. § 706

91.    The State incorporates by reference the allegations contained in the preceding paragraphs.

92.    Agency Defendants ordered Empire Wind to suspend any ongoing activities related to the Empire Wind Project "for reasons of national security." That rationale is purportedly based on "national security threats" raised in a November 2025 classified assessment conducted by DOW.

93.    The Suspension Order constitutes final agency action. *See* 5 U.S.C. § 704. Specifically, it "mark[s] the consummation of the agency's decisionmaking process" and is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted).

94.    Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

95.    The Suspension Order is arbitrary and capricious because it fails to (1) provide a reasoned explanation for suspending all activities; (2) explain Agency Defendants' change in position; (3) explain why a narrower alternative would not have addressed the Agency Defendants' concerns; or (4) provide a genuine justification for the suspension.

96.    *First*, an agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

31

97.    When an agency action is based on purported concerns about national security, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).

98.    The Suspension Order is arbitrary and capricious because it lacks a reasonable explanation for the suspension. BOEM did not identify any component of the Empire Wind Project that raised new national security concerns, nor did it explain why the Project's existing mitigation measures would not sufficiently address such concerns.

99.    *Second*, agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

100.    In 2024, after many years of exhaustive review, BOEM approved the Empire Wind Project, explaining that its decision was consistent with OCSLA, "which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals," including national security.[46] BOEM's approval was based upon and supported by an extensive record.

101.    The Suspension Order fails to explain BOEM's change in position.

---

[46] Record of Decision at 43; *see also* 43 U.S.C. § 1337(p)(4)(F) (enumerating "protection of national security interests of the United States" as a factor).

102.    BOEM also failed to consider the significant reliance interests that New York has formed based on BOEM's prior approval of and support for the Empire Wind Project. New York has relied on the Project as a component of its strategies to support grid reliability, energy diversification and climate goals. New York has also relied on the myriad benefits to it of the Project being timely completed and brought online.

103.    *Third*, agencies are required to "address" alternative "way[s] of achieving [their] objectives" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). BOEM failed to do so here.

104.    The Suspension Order provides no explanation for why the purported national security concerns required a total suspension of activities, including critical work related to undersea cables, testing of equipment, and commissioning. And, given that the lease states that national security suspensions will generally be limited to 72 hours, BOEM offers no explanation why it chose a 90-day suspension, with indefinite renewals of the same length.

105.    *Fourth*, agencies are required to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

106.    For several reasons, Agency Defendants' purported national security rationale is not a genuine justification for the Suspension Order.

107.    Despite the 2005 amendments to OCSLA making the Outer Continental Shelf available for renewable energy production, including offshore wind, the Interior Secretary has made countless statements in public interviews and announcements maligning offshore wind energy that are unrelated to national security, as did President Trump in a January 9 press conference. These statements, and the many actions President Trump has taken to stop the development of offshore wind energy, suggest that BOEM's Suspension Order could be based on political pressure, which is a consideration "not made relevant by Congress" in OCSLA, *see D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971), and is inconsistent with the Suspension Order's purported national security rationale.

108.    BOEM's issuance of the Suspension Order followed the U.S. District Court for the District of Massachusetts' December 8, 2025 decision and order vacating the Wind Order as arbitrary and capricious and contrary to law and this Court's September 22, 2025 order preliminarily enjoining BOEM's August 2025 Suspension Order to Revolution Wind.

109.    Even though the Suspension Order purports to be based on "classified information," the press release by DOI accompanying it discussed "unclassified reports from the U.S. Government," including a report written over a year ago.[47] The

---

[47] Press Release, *supra* note 40.

Interior Secretary has similarly made repeated unclassified statements on national news about "radar interference" and "drones."[48]

110.    In addition, even though BOEM purports to base the Suspension Order on the Empire Wind Project's "potential to cause serious, immediate, and irreparable harm" to national security,[49] Acting Director Giacona did not issue the Order until December 22, 2025, nearly a month after he first reviewed the classified information purportedly supporting that determination.

111.    Furthermore, the Suspension Order states that the harm posed by the Empire Wind Project "can only be feasibly averted by suspension of on-lease activities" but then "invites" Empire Wind to "meet and confer" about potential mitigation measures.[50] BOEM offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days or more may be required for resolution.

112.    The Suspension Order is arbitrary and capricious and should be vacated and set aside under the APA. 5 U.S.C. § 706.

## PRAYER FOR RELIEF

The State respectfully requests that this Court enter judgment:

1.    Declaring that the Suspension Order is arbitrary and capricious;

---

[48] *See, e.g.*, Fox News, *Doug Burgum Explains National Security Concerns that Led to Pausing Offshore Wind Projects*, at 00:10-00:25 (Dec. 22, 2025).

[49] Press Release, *supra* note 40.

[50] Letter from Matthew N. Giacona, *supra* note 1.

2.      Vacating the Suspension Order;

3.      Temporarily, preliminarily, and permanently enjoining Agency
        Defendants from enforcing the Suspension Order; and

4.      Granting such further relief as the Court deems just and proper,
        including, but not limited to, attorney's fees and costs.


Dated:       New York, New York
             January 9, 2026


                            LETITIA JAMES
                            Attorney General of New York

                     By:    /s/ Monica Wagner
                            Monica Wagner
                                Deputy Bureau Chief
                            Rene F. Hertzog
                            Laura Mirman-Heslin
                            Joya Sonnenfeldt
                                Assistant Attorneys General
                            Libby Dimenstein
                                Special Assistant Attorney General
                            Environmental Protection Bureau
                            28 Liberty Street
                            New York, New York 10005
                            (212) 416-6351
                            Monica.Wagner@ag.ny.gov

                            Morgan Costello
                                Deputy Bureau Chief
                            Environmental Protection Bureau
                            The Capitol
                            Albany, NY 12224